UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MICHAEL GRECCO PRODUCTIONS, INC.,  :
  :
                      Plaintiff,  :
  :
        -against-         :
  :
VALUEWALK, LLC and JACOB O. WOLINSKY, :
  :
                Defendants.  :
----------------------------------------------------------------X

1:16-cv-6171-GHW

OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

      Michael Grecco is a professional photographer, whose celebrity portraits and editorial images have appeared in publications such as Time, Vanity Fair, and Forbes. Grecco contracts with clients through Michael Grecco Productions ("MGP"), his photography studio and business. This matter arises from a copyrighted photograph that Grecco took for Barron's, a financial news outlet. Valuewalk, LLC is a competitor of Barron's, owned and operated by Jacob Wolinsky. After the Barron's article was published, Valuewalk issued its own article on the same subject, illustrated by a photograph identical to the one Grecco had taken—without MGP's permission. MGP brought this action, alleging that Valuewalk and Wolinsky directly infringed on its copyright in the image, that Wolinsky is vicariously and contributorily liable for Valuewalk's infringement, and that Valuewalk and Wolinsky have violated the Digital Millennium Copyright Act by intentionally removing the information identifying Grecco as the author of the work.

      Before the court are cross motions for partial summary judgment. MGP seeks judgment on Valuewalk's liability for copyright infringement, Wolinsky's liability for vicarious infringement, and the affirmative defenses asserted by Defendants under the fair use doctrine, the safe harbor provisions of the Digital Millennium Copyright Act, the misuse-of-copyright defense, and the statute of limitations of the Copyright Act. Pl.'s Mot. for Part. Summ. J. (ECF No. 99). Defendants seek

judgment dismissing Plaintiff's direct, contributory, and vicarious infringement claims against Wolinsky, as well as judgment regarding the alleged Digital Millennium Copyright Act violation by both Defendants. Defs.' Mot. for Part. Summ. J. Defs.' Mot. for Part. Summ. J. (ECF No. 78).

Because the photographs at issue here are substantially identical and publishing the image as an illustration to an article—the exact purpose for which the image was created—does not qualify as fair use, Plaintiff's motion is granted in part and denied in part; Defendants' motion is denied in whole.

## I. BACKGROUND[1]

### A. Facts

Michael Grecco is a professional photographer who specializes in celebrity portraiture, working with notable figures such as Martin Scorsese, Robert Duvall, and Lucy Liu. Compl. ¶ 7. Grecco's photos have appeared in Time, Vanity Fair, Forbes, and several other well-regarded publications. *Id.* Grecco contracts with clients through Plaintiff Michael Grecco Productions ("MGP"), his photography studio and business. *Id.* at 6. Grecco earns money by taking editorial photos for publishers and licensing his photos for fees as high as $13,500. *Id.*; Ex. 22 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-21) ("ImageRights Subpoena Response") at 13–14.

Grecco is also an advocate for copyright enforcement. He educates photographers on ways to protect their intellectual property rights and serves on the Advocacy Committee of the APA, which "fights for the rights of image creators." Compl. ¶¶ 9–10. Grecco dedicates his time and money to finding instances of copyright infringement and subsequently enforcing his rights under the Copyright Act. *Id.* ¶ 11.

#### 1. The Barron's Assignment

In February of 2011, Barron's, a financial news outlet, hired Grecco to take the photo at

---

[1] The following facts are undisputed unless otherwise noted.

issue in this case.  Defs.' 56.1 Stmt. ¶ 2; Ex. 2 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-2)

("Barron's Email to Grecco"). [2]  The assignment was for a cover story profiling Jeffrey Gundlach, a

prominent bond trader.  *Id.*  Grecco took a studio portrait of Gundlach, looking intently at the

camera with his arm clenched in a fist across his chest (the "Gundlach Image").  Ex. 4 to Pl.'s Mot.

for Part. Summ. J. (ECF No. 99-4) ("Barron's Article").  In the photo, Gundlach is positioned in

front of a staircase with a spotlight illuminating the left side of his face.  *Id.*  Grecco digitally

processed and retouched the photo to prepare it for publication.  Ex. 3 to Pl.'s Mot. for Part. Summ.

J. (ECF No. 99-3) ("MGP Invoice").  For his work, Grecco was paid $2,220.60, which included a

creative fee and a fee for editing the photo.  *Id.*

The Barron's article on Gundlach, entitled "The King of Bonds," was published in February

21, 2011.  Barron's Article.  The photograph appeared in Barron's cover story in both its print and

on-line editions.  Defs.' 56.1 Stmt. ¶ 2.  In both the print and online versions, the text "Michael

Grecco for Barron's" appears in a "gutter credit" beneath the Gundlach image.  *Id.* ¶ 3.  Barron's

employs a paywall on its website, blocking public access from certain articles without a subscription.

At some point in time, the paywall applied to the Gundlach article.  Ex. 4 to Ray Decl. (ECF No.

73-4) ("Barron's Paywall Page").

Barron's stores the image on its server at http://si.wsj.net/public/resources/images/BA-

AV026_Gundla_G_20110218174010.jpg, where it is still available today.  *Id.* ¶ 4; Ex. 5 to Pl.'s Mot.

for Part. Summ. J. (ECF No. 99-5) ("Barron's Server").  The photograph also appears as a search

result on Google image, and displays the copyright information identifying Grecco as the

photographer with a link to the Barron's article.  Ex. 6 to Ray Decl. (ECF No. 73-6) ("Google Image

---

[2] References to "Defs.' 56.1" are to the Rule 56.1 counterstatement submitted in connection with MGP's motion. References to "Pl.'s 56.1" are to the Rule 56.1 counterstatement submitted in connection with Valuewalk and Wolinsky's motion.  In both cases, the Rule 56.1 counterstatements contain both the assertions of the moving party and the responses of the non-moving party.

Search Result").

### 2.  The Copyright Registration

MGP registered its copyright in the Gundlach image with the United States Copyright Office on February 20, 2011 as Registration No. VAu 1-058-559.  Defs.' 56.1 Stmt. ¶ 5; Ex. 6 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-6) ("Certificate of Registration").  Under the terms of its agreement with Barron's, MGP retained copyright ownership and licensed the work to Barron's for its use in the "King of Bonds" article.  Defs.' 56.1 Stmt. ¶ 2.  MGP offers a stock license for the Gundlach image for $3,372.00.  Defs.' 56.1 Stmt. ¶ 6; Ex. 8 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-9) ("License Website").

### 3.  Valuewalk and Wolinsky

Defendant Valuewalk is a New York based limited liability company, organized under New Jersey law.  Defs.' 56.1 Stmt. ¶ 41; Ex. 10 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-11) ("Valuewalk Company Page").  Valuewalk owns www.valuewalk.com, a financial news outlet which is a competitor of Barron's.  *Id.* ¶ 24.  Like Barron's, Valuewalk publishes articles on financial topics and often supplements articles with photographs and graphics.  Pl.'s 56.1 Stmt. at ¶¶ 3, 20.

Defendant Wolinsky is Valuewalk's owner, sole member, its chief executive officer, and is responsible for its administrative and financial affairs.  *Id.* at ¶¶ 2, 10; Valuewalk Company Page.  Defendants contend that Wolinsky does not review or edit all articles prior to publication.  *Id.* at ¶¶ 27–28; Ex. 7-A to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-7) ("Wolinsky Dep.") at 30:19–20.  However, in his deposition, Wolinsky admitted that he has broad decision-making power to determine what content was published on Valuewalk.com.  Wolinsky Dep. at 330:5–331:8.  In his deposition, Wolinsky also admitted that, as Editor-in-Chief, "I could technically have final say over any material—any article we publish."  *Id.* at 30:12-14.; *see also* 331:3–8 (Wolinsky answering "[I]f I want to, I could" in response to a question asking whether he can make a decision about what gets

published on Valuewalk.com). Wolinsky states that he is not always involved in editorial decision-making, but when he is, no person at Valuewalk.com has authority to overrule his editorial decisions. Wolinsky Dep. at 38:13–21.

Valuewalk earns revenue from the sale of advertisements displayed on Valuewalk.com, which is the site's main source of revenue. Defs.' 56.1 Stmt. ¶ 34; Wolinsky Dep. at 44:14. Valuewalk displayed advertisements to readers who visited the Gundlach Resource Page and admits that it published the Resource Page to generate advertising revenue from reader page views. Defs.' 56.1 Stmt. ¶¶ 35–36. Wolinsky earns a salary, profits, and distributions from the advertising revenue generated by the number of page views on published articles. *Id.* ¶¶ 38–39.

### 4. Valuewalk's Company Policies

Valuewalk relies on contractors to create its content. *Id.* ¶ 29. The contractors are given assignments by Wolinsky and Valuewalk, and are paid piece-rate by word or article. *Id*; Wolinsky Dep. 110:1–111:3; Ex. 23 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-22) ("Valuewalk Page Instructions").

Valuewalk has previously used photographs on its website without properly identifying the author. Ex. 25 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-24) ("Barclays Image"); Ex. 26 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-25) ("AP Image"). Wolinsky has previously ignored allegations of infringement on the Valuewalk site. *See* Wolinsky Dep. at 134:9–18; Ex. 13 to Pl.'s 56.1 Stmt. (ECF No. 92-13) ("Trent Email Chain"); Ex. 21 to Pl.'s 56.1 Stmt. (ECF No. 92-21) ("Effie Gang Email Chain"). In March of 2015, the same year the alleged infringement here was discovered, a different photographer emailed Wolinsky to inform him that a photo he had taken for Barron's was posted on Valuewalk without a license, and as such, Valuewalk was required to pay a fee for its use. Trent Email Chain. Wolinsky instructed a Valuewalk employee to remove the copyrighted image without responding to the photographer and refused to pay the fee, even after

the photographer threatened to bring legal action.  Trent Email Chain.

Valuewalk maintains that it provides legal and administrative services to its contractors to assist with compliance with intellectual property laws.  Pl.'s 56.1 Stmt. ¶ 15.  However, Valuewalk admits that it did not provide any evidence that it advised its employees or contractors—or that any company policy existed—to  prevent copyright infringement prior to May 2016, after it was sued for copyright infringement by another party.  Defs.' 56.1 Stmt. ¶ 31.  Valuewalk did not designate an agent to whom complaints of copyright infringement should be sent with the Copyright Office prior to 2017.  *Id.* ¶ 40; *see also* Wolinsky Dep. at 244:12–245:1.

In Valuewalk's instructions regarding content preparation for its website, contractors are told to "download [images] from Google" for articles, without mention of intellectual property laws.  Valuewalk Page Instructions ("If you can't find images that are suitable for the article you can download it from Google images and then upload in WordPress media by selecting the upload.file option beside media library.").

### 5. Valuewalk's Resource Page on Gundlach

In 2012, Valuewalk published a "Resource Page" on Jeffrey Gundlach, the subject of Grecco's photograph for Barron's article. Ex. 16 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-17) ("2012 Valuewalk Page").  Wolinsky assigned an independent contractor named Sydra, located in Pakistan, to create the page.  Defs.' 56.1 Stmt. ¶ 11; Ex. 15 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-16) ("Gundlach Assignment Email").  In his instructions to Sydra, Wolinsky included the text and a photo to be used for the profile.  *Id.* Wolinsky sent Sydra a photograph obtained from Gundlach's assistant, clearly a different photo than the one at issue here.  Gundlach Assignment Email.  While the text on the final profile was the same text Wolinsky had emailed to Sydra, a different photo was used on the published version of the page.  *Id*; 2012 Valuewalk Page.  The photograph that appeared on the Gundlach page looked like the Grecco's Gundlach photograph,

without any copyright information identifying Grecco as the creator. 2012 Valuewalk Page; Barron's Article. Valuewalk did not have Grecco's consent, or a license from MGP, to use the photograph. Defs.' 56.1 Stmt. ¶ 54. Defendants claim Sydra independently decided to swap the image provided to her by Wolinsky for the Gundlach image, without Wolinsky's knowledge. *Id.* ¶ 13.

Plaintiff alleges that Valuewalk published the Gundlach profile twice: once in 2012 and again in 2015. *Id.* ¶ 18. There are two images stored on Valuewalk's server, at the URLs http://cdn1.valuewalk.com/wp-content/uploads/2012/03/ BAAV026_Gundla_G_201102181740101-300x200.jpg and http://www.valuewalk.com/wp-content/uploads/2012/03/ BAAV026_Gundla_G_201102181740101-300x200.jpg. *See* Ex. 17 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-18) ("ImageRights Sighting Results"). There are two different versions of the Gundlach profile in the record. 2012 Valuewalk Page; Ex. 18 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-19) ("2015 Valuewalk Page"). The 2015 page uses the same photograph as the 2012 page, with updated information on Gundlach and is located at a different URL address. 2012 Valuewalk Page; 2015 Valuewalk Page. Unlike the 2012 page, the 2015 version says the article was "Developed by Valuewalk Team." 2015 Valuewalk Page; Defs.' 56.1 Stmt. ¶ 18. The Defendants claim they only posted the Gundlach page once, in 2012, and the page was available to the public from 2012–2016. Defs.' 56.1 Stmt. ¶ 18. Defendants explain the differences between the pages by claiming they were the result of a change in servers. *Id.* Regular views of the 2012 profile stopped on February 2, 2015 and views of the 2015 profile commenced on February 25, 2015. Ex. 12 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-13) ("2012 Resource Page Views"); Ex. 13 to Pl.'s Mot. for Part. Summ. J. (ECF No. 99-14) ("2015 Resource Page Views").

The title of the 2012 Gundlach Valuewalk profile page was "The New Bond King." *Id.* Both the 2012 and 2015 Gundlach profile referenced the Barron's "King of Bonds" article. In both versions, the introduction section states "Barron's in a February 2011 cover story called him the

7

"King of Bonds." 2012 Valuewalk Page; 2015 Valuewalk Page. In the 2012 version, the article also states "In a 2011 cover story, Barron's magazine anointed Jeff Gundlach as the 'New Bond King' noting that in a career marked by genius and controversy, he had outpaced even Bill Gross." 2012 Valuewalk Page.

In 2015, MGP discovered Barron's use of the image by running a Google search on the Gundlach image. Defs.' 56.1 Stmt. ¶ 22. The copyright infringement search company, ImageRights, conducted a search that showed two copies of the photograph were stored on Valuewalk's server. ImageRights Sighting Results. Grecco had no communications with ImageRights regarding Valuewalk or the Gundlach Image prior to June of 2016. *Id.* ¶ 23.

Defendants claim that the images are not identical because they are different sizes: Grecco's image being a 553 x 369 pixel 40KB image while Valuewalk's image is 300 x 200 pixels. Defs.' Opp. to Pl.'s Mot. for Summ. J. (ECF No. 85) ("Defs.' Opp.") at 5; Defs.' 56.1 Stmt. ¶ 14. Defendants further assert that the Grecco's image has a "glossy, professional finish" whereas their version has a "flat, filtered effect." Defs.' Opp. at 5; Defs.' 56.1 Stmt. ¶ 14. Defendants claim that these differences render the Valuewalk photo a new creation because their version of the photograph "lacks the alleged qualities" that make Grecco's image "unique and different." Defs.' Opp. at 5; Defs.' 56.1 Stmt. ¶ 14. Grecco's photograph for Barron's and the photos used by Valuewalk on its website are displayed below:



Jeffrey Gundlach *Michael Grecco for Barron's*

Barron's Article



2012 Valuewalk Page

2015 Valuewalk Page

### B. Procedural History

Michael Grecco Productions initiated this action on August 4, 2016, ECF No. 1, and Defendants Valuewalk, LLC and Jacob O. Wolinsky filed their answer on October 7, 2016, ECF No. 20.

On June 19, 2017, MGP filed a motion for partial summary judgement. ECF No. 70. Valuewalk and Wolinsky filed their opposition to MGP's motion on July 24, 2017, ECF Nos. 85–89, and MGP filed its reply on August 7, 2017, ECF No. 100.

Valuewalk and Wolinsky also filed their motion for partial summary judgment on June 19, 2017. ECF No. 71. MGP filed its opposition on July 24, 2017, ECF No. 91, and Valuewalk and Wolinsky filed their reply on August 7, 2017. ECF Nos. 97–98.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."

*Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted),

and she "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed.*

*Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

> In determining whether there exists a genuine dispute as to a material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)

(citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is not to "weigh the

evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002)

(citation omitted).  "Assessments of credibility and choices between conflicting versions of the

events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*,

426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).  "[T]he judge must ask . . . not whether . . . the

evidence unmistakably favors one side or the other but whether a fair-minded jury could return a

verdict for the [non-movant] on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at

252).  "Summary judgment is improper if any evidence in the record from any source would enable a

reasonable inference to be drawn in favor of the nonmoving party." *Gym Door Repairs, Inc. v. Young*

*Equip. Sales, Inc.*, No. 15-cv-4244 (JGK), 2018 WL 4489278, at *2 (S.D.N.Y. Sept. 19, 2018) (citing

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

> When resolving cross-motions for summary judgment, the same standards apply.  "[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* at 121(citations omitted).

## III.  DISCUSSION

In its motion for summary judgement, Plaintiff seeks judgment on Valuewalk's liability for copyright infringement, Wolinsky's liability for vicarious copyright infringement, and on four of the affirmative defenses Defendants raised in their Answer.  In its cross-motion, Defendants move for summary judgment on the issues of Wolinsky's direct, contributory, and vicarious liability, and on Valuewalk and Wolinsky's liability for the alleged violation of the Digital Millennium Copyright Act. For the following reasons, Plaintiff's motion is granted in part and denied in part.  Defendants' motion is denied in whole.

### A.  Choice of Law

As a threshold matter, the copyright laws of the United States apply here.  Defendants present a fundamentally erroneous argument that Plaintiff's claims should be evaluated under Pakistani law.  The Defendants point to *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998), for the proposition that the conflict of laws principle of *lex loci delicti* governs infringement claims regarding copyright.  And, indeed, it does.  But the doctrine of *lex loci deliciti* points to the law of the place where the acts giving rise to the liability occurred, and the tort in this case clearly occurred in the United States, not Pakistan.  The Copyright Acts prohibits the publication, reproduction and distribution of copyrighted works, all of which took place in the

United States.  Pl.'s Rep. to Defs.' Opp. to Pl.'s Mot. for Summ. J. (ECF No. 100) ("Pl.'s Rep.") at 2–3.  Defendants' myopically perceive the *forum delicti* as the location where the contractor selected the image for inclusion on the webpage.  But the fact that a single step in the chain of the creation and publication of an article by a United States company for publication in the United States happened in Pakistan does not make that forum the place of the tort.  The place of the tort—the *forum delicti* here is the United States.

Defendants' argument—that by using a foreign contractor to choose photographs to include in a website directed at directed at United States consumers, a United States based company can avoid liability under the Copyright Act—teeters on line of frivolity, if it does not cross it.  These U.S.-based defendants cannot escape liability under the Copyright Act by offshoring part of their production process.  To hold otherwise would profoundly undermine the protection of the Copyright Act in the United States.

Moreover, even if the location of the tort was narrowly construed to be in Pakistan, while the law is well established that copyright laws have no extraterritorial effect, there is an exception "when those [foreign] acts are intended to, and do, have an effect within the United States." *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 773 (W.D.N.Y. 1991) ("[T]he court does not limit its inquiry to a purely mechanical examination of where [the infringing] acts physically took place. In fact, it is precisely because the copyright statutes are aimed at infringement in the United States that the court must also consider the location of the *effect* of [Defendant's] alleged actions.") (emphasis added).  The allegedly infringing images was stored on Valuewalk's server in the United States, was accessible from computers within the United States, and its use was directed towards United States readers.  *See McGraw-Hill Companies, Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 257 (S.D.N.Y. 2005) ("[N]o such extraterritorial application is contemplated in this case, where plaintiff seeks an injunction that applies to activities felt within the

United States."); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 225 (S.D.N.Y. 2002) (holding that a similar defense regarding the extraterritorial application of copyright laws "borders on the frivolous" where allegedly infringing material is accessible from computers within United States).

### B. Copyright Infringement

Plaintiff moves for summary judgment on the issue of direct copyright infringement by Valuewalk, arguing that Valuewalk has infringed on its copyright by "engaging in the unauthorized reproduction and distribution of the work, and by creating a derivative work incorporating the protected work, by publishing an exact copy on their website of the image." Pl.'s Mot. for Part. Summ. J. at 2. Plaintiff has established liability for copyright infringement by Valuewalk. However, as the Court discusses below, there is a genuine issue of material fact regarding whether or not this claim is barred by the statute of limitations. Therefore, Plaintiff's motion must be denied pending resolution of that question.

Defendants move for summary judgment on the issue of Wolinsky's liability for direct infringement. There is a material dispute of fact as to Wolinsky's level of involvement in the infringement, so this issue must be reserved for trial.

The Copyright Act grants the owner of the copyright the exclusive right to authorize the reproduction, distribution, and preparation of derivatives of the owner's work. 17 U.S.C. § 106; *see Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 546–47 (1985). Plaintiff must prove the following elements for an infringement claim: (1) it holds a valid ownership interest in the relevant copyrights, (2) defendants have "actually copied" their works, and (3) defendants' copying is illegal because of a "substantial similarity" between defendants' works and the "protectable elements" of their copyrighted works. *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). For a derivative work claim, "plaintiffs must further prove that (4) defendants'

works are unauthorized derivatives under 17 U.S.C. § 106(2)." *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 744 (S.D.N.Y. 2017). Conversely, to prevail on a motion for summary judgment, Defendants must demonstrate the absence of material evidence supporting an essential element of Plaintiff's copyright infringement claim. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

### 1. Ownership of a Valid Copyright

A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright. *See id.* at 51 (citing 17 U.S.C. § 410(c)). The parties do not dispute that the Plaintiff validly obtained a certificate of registration from the United States copyright office for the Gundlach image. Indeed, the Plaintiff has provided a certificate of registration of the copyright. Thus, the undisputed evidence presented by MGP satisfies the first element of an infringement claim.

### 2. Actual Copying

Actual copying may be established with circumstantial evidence that the defendant had access to the copyrighted work and that there are probative similarities between the works. *Id.* Access can be proven through circumstantial evidence that the defendant had a reasonable opportunity to observe the plaintiff's work. *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999). In general, "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." *Jorgensen,* 351 F.3d at 56 (internal citation and quotation marks omitted). Where "the works in question are 'so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.'" *Id.* (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995)). It should be noted that the "probative similarity" inquiry is different than the "substantial similarity" element of the infringement claim. *Castle Rock*, 150 F.3d at 137. "'Probative similarity' is a less demanding test

than 'substantial similarity,' requiring only that there are similarities between the two works that would not be expected to arise if the works had been independently created." *Odegard, Inc. v. Costikyan Classic Carpets, Inc.,* 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997).

Here, the Valuewalk profiles on Jeffrey Gundlach explicitly reference the Barron's article that contained the Gundlach photo. 2012 Valuewalk Page; 2015 Valuewalk Page. The file names for the Gundlach images stored on Valuewalk's server are nearly identical to the file name stored on Barron's server. *Compare* ImageRights Sighting Results, *with* Barron's Server (showing that the file extensions stored on Valuewalk's and Barron's servers only differ by one character). Further, the need to demonstrate access is not as strong because the probative similarity between the two images is unmistakable in this case. Here, a picture is worth a thousand words— one need only peruse the images to conclude that the two works are identical. Accordingly, MGP has satisfied the actual copying element in its claim against Valuewalk.

However, Defendants have not met their burden for summary judgment regarding Wolinsky's liability for direct infringement because there does exist a genuine issue of material fact as to what Wolinsky's level of involvement was in the infringement. The record certainly indicates that Wolinsky could have had access to the photograph: the draft text from Wolinsky for the Gundlach page referenced the Barron's article. Gundlach Assignment Email. Wolinsky himself admitted that he read Barron's magazine. Wolinsky Dep. at 40:16–41:15. Such evidence is more than "some metaphysical doubt," *Matsushita*, 475 U.S. at 586 (citations omitted), and when combined with the probative similarity of the works, a reasonable factfinder could find for Plaintiff. Defendants' motion for summary judgment on Wolinsky's liability for direct infringement must be denied since there is a material issue of fact regarding actual copying, one of the claim's requirements. Therefore, though the Court will analyze the remaining elements of the infringement claim for Valuewalk, it need not address them for Wolinsky.

### 3. Substantial Similarity

In addition to showing that there is no issue of material fact regarding actual copying, the Plaintiff must show that the works are also substantially similar to prevail on a summary judgment motion. Here, as with the probative similarity inquiry, there is no question that a reasonable jury would find that the works are substantially similar.

Substantial similarity exists between the defendant's work and the protected aspects of the plaintiff's work when the copying at issue "is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 71, 75 (2d Cir. 1997). The qualitative component turns on the "ordinary observer test," which asks "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks and citations omitted). The quantitative component "generally concerns the amount of the copyrighted work that is copied, a consideration that is especially pertinent to exact copying." *Ringgold*, 126 F.3d at 75. When the copying is *de minimis*—that is, when the copying "has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity"—it is not unlawful. *Id.* at 74–75.

Here, the image used was "not merely substantially similar, [it is] identical to the images licensed to the third-party site[ ]." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 402 (S.D.N.Y. 2016) (finding that the Plaintiff had established direct copying where the allegedly infringing images were identical to Plaintiff's works). Valuewalk's use of the Gundlach image is more than *de minimis* copying. Though Defendants point to a few insignificant similarities between the photo it published and the original, the Defendants' photos are clearly the same photograph as published in Barron's. *See Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) ("[N]o copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated.").

A side-by-side comparison demonstrates that, even if there were any disparities between the Plaintiff's image and those published by the Defendants, there is no doubt that an ordinary observer would not notice them.

The Court must comment on Defendants' argument that its use of the image is not infringing because the photos are different pixel sizes. This position is unquestionably meritless. In order to serve the ultimate purpose of copyright protections— to stimulate authorship and intellectual expression—the copyright holder must have the exclusive ability to control the quality and manner in which her work appears. *See* 17 U.S.C. § 106 ("the owner of [a] copyright . . . has the exclusive right to reproduce the copyrighted work . . . to prepare derivative works . . . to display the copyrighted works publicly . . . ."; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) ("The Copyright Act furthers this core purpose by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship."). Allowing infringers to freely use a copyrighted work with impunity if they only degrade its quality would enfeeble any force of the copyright holder's limited monopoly.

There is no material issue of fact on the issue of Valuewalk's infringement because a reasonable jury comparing the works "could only reach one inescapable conclusion: the images are substantially similar because they are exact copies." *Jackson v. Odenat*, 9 F. Supp. 3d 342, 352 (S.D.N.Y. 2014). However, for the reasons discussed below, summary judgment must be denied because there is a genuine issue of material fact on whether the statute of limitations has run, precluding a finding of liability at this stage of the case. Therefore, although Plaintiff has established that Valuewalk directly infringed on its work, a finding of liability must await resolution of the statute of limitations question at trial.

### 4. Derivative Work

Plaintiff additionally argues that Defendants have violated their right to control the

preparation of derivative works from the Gundlach image. Plaintiff here alleges that because

Defendants have used its photograph in the "Jeffrey Gundlach Resource Pages" the Resource Pages

themselves are derivative works in violation of its rights under the Copyright Act. Pl.'s Mot. for

Part. Summ. J. at 5. The right "to prepare derivative works based upon the copyrighted work" is an

exclusive right guaranteed by the Copyright Act to the owner of any copyright. 17 U.S.C. § 106(2).

The Copyright Act defines a "derivative work" as "a work based upon one or more preexisting

works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture

version, sound recording, art reproduction, abridgment, condensation, or any other form in which a

work may be recast, transformed, or adapted." 17 U.S.C. § 101. The "market for potential

derivative uses includes only those that creators of original works would in general develop or

license others to develop." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 592 (1994).

The Resource Pages—essentially news articles profiling a notable person—is precisely the

type of work for which Grecco created the photograph and the limited market for the Gundlach

image existed. The Resource Pages were illustrated by the Gundlach photograph, but Defendants

admit that MGP never authorized Valuewalk or any affiliate or employee of Valuewalk to use the

copyrighted photo. Defs.' 56.1 Stmt. ¶ 54; 2012 Valuewalk Page; 2015 Valuewalk Page. Therefore,

the Resource Pages are unauthorized derivatives as a matter of law.

For the aforementioned reasons, Defendants have infringed upon Plaintiff's exclusive right

to exercise its limited monopoly in reproducing, distributing, and preparing derivative works based

on its photo. Plaintiff is entitled to judgment on its copyright infringement claim, pending

resolution of the statute of limitations question at trial.

### C. Vicarious Liability

Both Plaintiff and Defendants move for summary judgment on the issue of whether

Wolinsky can be found vicariously liable for copyright infringement. Because there are genuine

issues of material fact on this issue, the motions must be denied.

To be found vicariously liable for copyright infringement, the defendant must have the right and ability to supervise the infringing act and a direct financial interest in the infringing activity. *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Vicarious liability, unlike contributory liability, does not require the defendant to have actual knowledge of the infringement. *Id.*

As an initial matter, Defendants rely on cases that are inapplicable here. Defendants correctly state that the "potential to police," rather than a showing of actual control over the infringement, is insufficient to support a vicarious liability claim. Defendants cite to *Berry v. Deutsche Bank Trust Co. Ams.*, to support this argument, but in *Berry*, the issue was whether a lender had the requisite control over an infringing borrower. No. 07-cv-7634 (WHP), 2008 WL 4694968 at *5 (S.D.N.Y. Oct. 21, 2008), *aff'd*, 378 F. App'x 110 (2d Cir. 2010). The court found that "some degree of control or supervision," more than the ability to withdraw financial support, was needed to establish a vicarious liability claim. *Id.* The distant lender-borrower analogy does not apply here, given that Wolinsky supervised personnel and assigned projects to Valuewalk's contractors himself. Unlike the defendant in *Berry*, Wolinsky's path crossed with Valuewalk's on a daily basis and he was in a position to control the activities responsible for the underlying infringement. *Id.*

The Defendants also cite to *Mayimba Music Inc.* to support their argument that mere ownership is insufficient to establish vicarious liability, but that case is similarly inapplicable. In *Mayimba*, the defendant had little involvement with the infringer, as it was only a parent company. *Mayimba Music, Inc. v. Sony Corp. of Am.*, No. 12-cv-1094 (AKH), 2014 WL 5334698, at *13 (S.D.N.Y. Aug. 19, 2014). Wolinsky's relationship with Valuewalk was not akin to that of a parent and its subsidiary, as in *Mayimba*. Wolinsky was the owner, CEO, and sole member of the company and operated the company on a full-time basis. Wolinsky worked directly with the company's employees

and contractors.  *Mayimba* is clearly not on point.

The legal standard for vicarious liability requires that Wolinsky had the *ability* to supervise or control the infringing activities.  *Gershwin,* 443 F.2d at 1162.  A reasonable jury could differ as to whether he did.  Just because Wolinsky claims he did not review the images on his own website for four years does not mean he did not have the authority to so, or that he could not control those images.  Defs.' 56.1 Stmt. ¶ 67.

There is also a material dispute over whether Wolinsky had a direct financial interest in the infringing activity.  The second element of a vicarious infringement claim requires a "causal relationship between the infringing activity and any financial benefit [the] defendant reaps." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (internal quotation marks and citations omitted).  "The financial benefit need not be tied directly to sales of the infringing goods, nor must it be substantial" and "exists where the availability of infringing material acts as a draw for customers." *Rams v. Def Jam Recordings, Inc.,* 202 F. Supp. 3d 376, 385 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).  Wolinsky, the owner and CEO of Valuewalk, did receive revenue from companies who advertised on Valuewalk when readers viewed the Gundlach page.  Defs.' 56.1 Stmt. at ¶¶ 38–39.  There were advertisements on the Gundlach page, which Valuewalk created to draw more readers and generate page views.  *Id.* at ¶¶ 35–36.  However, the parties dispute whether the allegedly infringing image itself, rather than the text of the page, was used to attract readers in an effort increase revenue.  *Id.* ¶ 38.

Under these circumstances, a jury could reasonably differ on whether Wolinsky had the ability to supervise Valuewalk's activities regarding the photo, and whether his financial interest in Valuewalk's publication of the copyrighted work is sufficient for a vicarious liability claim.  Because there exist genuine disputes regarding the material facts on this issue, each party's motion for summary judgment on the issue of whether Wolinsky is vicariously liable copyright infringement is

denied.

### D. Affirmative Defenses

Plaintiff seeks summary judgment dismissing Defendants' affirmative defenses regarding the statute of limitations, the fair use doctrine, the safe harbor provisions of the Digital Millennium Copyright Act, and copyright misuse. Where, as here, "a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex*, 477 U.S. at 325).

### 1. Fair Use

Plaintiff moves for summary judgment on Defendants' fair use defense. As stated previously, the purpose of copyright law is "[t]o promote the Progress of Science and useful Arts . . . ," U.S. Const., Art. I, § 8, cl. 8, and "expand public knowledge and understanding . . . by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). "[W]hile authors are undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended beneficiary is the public, whose access to knowledge copyright seeks to advance by providing rewards for authorship." *Id.* Thus, the fair use doctrine is a statutory exception to copyright infringement, permitting the unauthorized use of a protected work for certain purposes. 17 U.S.C. § 107.

"[T]he fair use determination is an open-ended and context sensitive inquiry," weighing four non-exclusive statutorily provided factors in light of the purposes of copyright. *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013). The fair use factors are (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation

to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. The Second Circuit has found that these statutory factors are not requirements and that the party requesting a judgment of fair use need not demonstrate that every factor weighs in its favor. *Cariou*, 714 F.3d at 705. However, "[t]he ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Castle Rock,* 150 F.3d at 141.

Although "[f]air use is a mixed question of law and fact," *Harper & Row,* 471 U.S. at 560 (1985), the Second Circuit has resolved fair use determinations at the summary judgment stage where the moving party shows there are no genuine issues of material fact. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) ("The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes."); see also *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (affirming summary judgment awarded to defendants on basis of fair use defense).

### i. Purpose and Character of the Work

The first factor, termed "the heart of the fair use inquiry," looks to the purpose and character of the use, including whether the use is for commercial or nonprofit educational purposes. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001). The central purpose of the first factor is to determine the "whether and to what extent the work is transformative." *Campbell*, 510 U.S. at 579. "If the secondary use adds value to the original—if the copyrightable expression in the original work [must be] used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock*, 150 F.3d at 141 (internal citations omitted); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (observing that a

transformative use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.") (citing *Campbell*, 510 U.S. 569, 579). "With regard to photographs, "[u]sing a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *BWP Media USA*, 196 F. Supp. 3d at 407.

No reasonable factfinder could come to the conclusion that Valuewalk's publication of the Gundlach portrait adds new meaning or expression to the images, in furtherance of "the Progress of Science and useful Arts." U.S. Const., Art. I, § 8, cl. 8. Nothing in the Valuewalk article "places it in a context different from that in which it was displayed" on Barron's. *BWP Media USA*, 196 F. Supp. 3d at 405. Here, Valuewalk used the Gundlach image in the same manner as its original publication: to accompany a profile of Mr. Gundlach. As in *BWP Media USA*, Defendants "used the photograph[ ] to illustrate its stor[y], which is precisely the same use as that made by the source website[ ]," weighing against a finding of fair use. *Id.*

Defendants rely heavily on *Bill Graham Archives* to support their position that Valuewalk's use of the Gundlach image was transformative. In that case, the Second Circuit noted that fair use protection is "frequently afforded . . . to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation for original source material for optimum treatment of their subjects." *Bill Graham Archives*, 448 F.3d at 609. In *Bill Graham Archives*, a significantly reduced version of Grateful Dead concert posters were included in a collage as part of a biographical tome on the music group. The court held that the biographical work was transformative and significantly different from the posters' original purpose of promoting concerts, as they were "displayed to commemorate historic events, arranged in a creative fashion, and displayed in significantly reduced form." *Id.* at 608–09.

Defendants contend that their use is transformative because the Gundlach Resource Page, like the collage in *Bill Graham Archives*, is part of an "overall series of biographical works" that use

the images in connection with "facts, references, biographical information and commentary." Defs.'

Opp. at 7. Defendants further attempt to latch their case onto *Bill Graham Archive*s by claiming that

their use of the image should also be considered transformative because they, like the defendants in

that case, changed the size of the image, added textual material to create a larger work, and used the

image in a manner inconsequential to the overall work. *Id.* at 8–9.

No reasonable juror would find that any changes Defendants made, if any, amounted to the

significance of the changes made in *Bill Graham Archives*. Most notably, in *Graham*, the thrust of the

court's determination that the use was transformative was hinged on the use's "purpose [being]

separate and distinct form the original artistic and promotional purpose for which the images were

created." *Bill Graham Archives,* 448 F.3d at 609–610. Here, Valuewalk's use of the image was not

"plainly different from the original purpose for which they were created." Barron's hired Grecco to

create the photograph to illustrate a biographical article on Gundlach, the same exact purpose for

which Valuewalk used the image.

The first factor also asks whether the image was used for a commercial or nonprofit

educational purpose, where commercial use tends to weigh against a finding of fair use. *See

NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004). "The crux of the profit/nonprofit

distinction is not whether the sole motive of the use is monetary gain but whether the user stands to

profit from exploitation of copyrighted material without paying the customary price." *Harper &

Row*, 471 U.S. at 562. If the court determines that the work was transformative, the commercial or

non-profit nature of the use has less significance. *Id.* Here, Defendants' use is not transformative

and the undisputed commercial nature of that use weighs against the application of the fair use

defense.

### ii.  Nature of the Copyrighted Work

The second factor, which looks to the nature of the copyrighted work, is neutral on balance

and does not weigh in favor of either party.  In reviewing the second factor, courts will determine whether a work is expressive or creative rather than factual or informational, and unpublished versus published, with the scope of fair use applying more narrowly to creative and unpublished works. *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (internal citations omitted); *see also Harper & Row*, 471 U.S. at 563–64.

A photograph's informational purpose "does not negate a finding of imaginativeness or creativity." *Mathieson v. Associated Press*, No. 90-cv-6945 (LMM), 1992 WL 164447, at *6 (S.D.N.Y. June 25, 1992).  "Although photographs are often 'factual or informational in nature,' the art of photography has generally been deemed sufficiently creative to make the second fair use factor weigh in favor of photographer-plaintiffs." *Baraban v. Time Warner, Inc.*, No. 99-cv-1569 (JSM), 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000).  In cases similar to this one, other courts in this District have found images even as factual as those depicting products for a catalog, to be creative, rather than informational. *Strauss v. Hearst Corp.*, No. 85-cv-10017 (CSH), 1988 WL 18932, at *5 (S.D.N.Y. Feb. 19, 1988) ("Plaintiff's efforts to create an aesthetically attractive, technically competent photograph were plainly creative expressions.").

Grecco's photograph is unmistakably a creative work.  The parties do not dispute that the Gundlach photograph is a staged studio image.  The bright background serves as a striking contrast to Gundlach's dark suit, drawing the attention of the viewer to the subject of the photograph. Grecco posed Gundlach facing the camera confrontationally, with his arm bent in front of his chest. Gundlach is staring into the camera intensely, with a spotlight hitting his face from a downward angle on the left side of the frame.  His hand is clenched in a fist and he appears to be gesturing towards himself, fitting for an article entitled "King of Bonds."

However, while the photograph itself is creative, the parties do not dispute that the photograph was widely disseminated, published in two forms of media, or that Grecco was paid for

his work.  Publicly released works qualify for far less protection from use by others than do unpublished materials.  *Harper & Row*, 471 U.S. at 564.  This is because a "plaintiff's right to control the first public appearance of the [photo] is not implicated [in such scenarios], nor does there exist any 'race to publish,'" which lends itself to a finding of fair use.  *Mathieson,* 1992 WL 164447, at *6.

Because the photograph is creative and published, this factor does not weigh in either party's favor.  However, this Circuit has noted that the second factor does not carry much weight in the fair use analysis and is "rarely found to be determinative."  *On Davis*, 246 F.3d at 175.

### iii.  Amount and Substantiality of the Portion Used

The third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," weighs against a finding of fair use.  17 U.S.C. § 107(3).  Courts will ask "whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying."  *Blanch*, 467 F.3d at 257 (citing *Campbell*, 510 U.S. at 586).  "The more of a copyrighted work that is taken, the less likely the use is to be fair."  *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998).  However, courts have found the use of a full image reasonable when necessary for incorporating the work into a larger piece, as in *Bill Graham Archives*, or in search engine databases to "allow users to recognize the image and decide whether to pursue more information about the image or the originating web site."  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003).

Defendants cite to *Bill Graham Archives* and *Kelly* for the proposition that using photographs in their entirety constitutes fair use when the purpose of the use requires it.  However, in those cases, the infringing images were scaled-down versions of the original and clearly not a substitute for the original.  Here, Valuewalk's use is "the equivalent of a full-scale reproduction of the image."  *Magnum Photos Int'l, Inc. v. Houk Gallery, Inc.*, No. 16-cv-7030 (VSB), 2018 WL 4538902 at *4 (S.D.N.Y. Sept. 21, 2018).  Though Valuewalk claims the photos are not identical, the effect on any

viewer is the same: the subject of the image, Mr. Gundlach, appears untouched and clearly visible. *See* Barron's Article; 2012 Valuewalk Page; 2015 Valuewalk Page. This is true regardless of whether Defendants slightly degraded the size and quality of the image. Valuewalk's purpose in using the photograph of Gundlach was to provide a biographical image to accompany its article, the same reason that Grecco created the photograph for Barron's. Because Defendant used the photo in its entirety without substantial changes to the purpose of using the photo, the third factor weighs against a finding of fair use.

### iv. Effect of the Use on the Potential Market.

The fourth and last fair use factor examines the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). Courts look for more than a speculative harm, where the copying of "sufficiently significant portions of the original as to make available a significantly competing substitute." *Authors Guild*, 804 F.3d at 223. There exists a "close linkage between the first and fourth factors, in that the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Id.* This factor focuses on whether the use would "deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Id.*

The fourth factor weighs in favor of Plaintiff if it can show that if the challenged use "should become widespread, it would adversely affect the *potential market for* the copyrighted work," including derivative works. *Bill Graham Archives*, 448 F.3d at 613 (citing *Harper & Row,* 471 U.S. at 568) (emphasis added); *see also Warner Bros. Entm't Inc. v. RDR Books,* 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008) ("[T]he fourth factor favors Plaintiff[ ] if publication of the Lexicon would impair the market for derivative works that [Plaintiff] is entitled or likely to license."); *Rogers*, 960 F.2d at 312 ("Hence the inquiry considers not only harm to the market for the original photograph, but also

harm to the market for derivative works."). "The fourth factor disfavors a finding of fair use only when the market is impaired because the material serves the consumer as a substitute or supersedes the use of the original." *Bill Graham Archives*, 448 F.3d at 613 (internal quotation marks and citations omitted).

Defendants again rely on *Bill Graham Archives* to advance their argument for this factor. However, in *Bill Graham Archives*, the parties agreed that the defendant's use of the image in its collage did not impact the primary market for the sale of the poster. *Id.* at 614. The court determined that because the defendant's use was transformatively different from its original expressive purpose, the plaintiff did not suffer market harm for the loss of license fees. *Id.* at 615.

Here, as noted in the Court's analysis of the first and third factors, Valuewalk's use of the Gundlach image was not transformative and served as a substitute for the original work. Valuewalk is a competitor of Barron's, which originally published the image. In addition, Defendants' statement that "Plaintiff [does not] makes money on selling photographs" is incorrect. Defs.' Mot. for Part. Summ. J. at 12. The record shows that MGP was paid handsomely for licensing the Gundlach photograph for republication on three separate occasions, as much as $13,500 in one instance. Pl.'s Rep. at 7; ImageRights Subpoena Response at 13–14. Furthermore, the inquiry looks to whether infringement will affect the *potential* market for the copyrighted work in "traditional, reasonable, or *likely to be developed* markets." *Bill Graham Archives*, 448 F.3d at 614 (emphasis added). Because the images are substantially identical, publication by Defendants affect the market for the work—more supply, less demand. The publication can reasonably be expected to harm Plaintiff's ability to license the work for publication and use in derivative works. Accordingly, the fourth factor weighs against a finding of fair use.

### v. Balance

On balance, weighing the four non-exclusive factors in light of the purposes of copyright,

28

the Court finds that Valuewalk's publication of the image was not fair use. The non-transformative purpose of Valuewalk's commercial use of the image; the fact that Defendants used the image in its entirety; and the potential harm to Plaintiff's business model outweigh the neutral fact that the image is creative and published. Allowing a commercial competitor to use a substantially identical, creative image to illustrate an article—the exact purpose as the work's original use—does not promote "the Progress of science and useful Arts." U.S. Const., art. I, § 8, cl. 8; *see Castle Rock*, 150 F.3d at 141. Accordingly, no reasonable trier of fact could find in favor of the Defendants on the issue of fair use and Plaintiff's motion for summary judgment on the defense is granted.

## 2. Safe Harbor Provision of the DMCA

Plaintiff moves for summary judgment to dismiss Defendants' safe harbor defense. Though Defendants asserted the defense, which would grant them protection under the safe harbor provisions of the Digital Millennium Copyright Act, in their Answer, Defendants did not address the issue in their opposition briefing nor did they adduce any evidence to support its use. However, Defendants' failure to oppose Plaintiff's motion on the safe harbor defense does not in itself justify the granting of summary judgment. "[W]here the non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)). Plaintiff has met its burden of production here, and therefore, judgment is granted in its favor.

The Digital Millennium Copyright Act sets forth four safe harbor provisions to the Copyright Act in the form of 17 U.S.C. §§ 512(a)–(d). Those safe harbors shield service providers from liability for copyright infringement under certain circumstances, provided that the party

seeking the defense first meets a set of threshold criteria. 17 U.S.C. § 512; *Viacom Int'l, Inc., v. Youtube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012). The party (1) must meet the statute's definition of service provider; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must accommodate standard technical measures used by copyright owners to identify or protect copyrighted works. 17 U.S.C. §§ 512(i), (k); *see also Viacom*, 676 F.3d at 27. Once a party meets these threshold requirements, the service provider becomes eligible for a safe harbor. The only applicable safe harbor defense here is Section 512(c), which provides protection from liability for, among other things, "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1).

There is no evidence in the record that would suggest Defendants meet even the threshold requirements for the DMCA safe harbor defenses to apply, particularly the repeat infringer policy requirement. In fact, the record supports the opposite conclusion: Defendants were aware of prior potential copyright violations, and ignored them. Wolinsky Depo. at 134:9–18. Though Wolinsky says he "discussed copyright" with his employees, Defendants have not provided any licensing policies or established procedures to ensure that the images used on its site do not infringe others' copyrights. *Id.* at 115:4–116:4; Defs.' 56.1 Stmt. ¶ 31. Valuewalk's instructions for employees regarding publication instruct them to download an image from Google, with no mention of potential copyright issues. Valuewalk Page Instructions ("If you can't find images that are suitable for the article you can download it from Google images and then upload in WordPress media by selecting the upload.file option beside media library.").

There is also no evidence in the record that would suggest Defendants meet the requirements of Section 512(c). The statute requires the service provider to designate an agent to receive notifications of claimed infringement and that it make the agent's contact information

available to the public. 17 U.S.C. § 512(c)(2). The parties do not dispute that "Valuewalk did not designate an agent [with the Copyright Office] to whom complaints of copyright infringement should be sent" at the time of the infringement. Defs.' 56.1 Stmt. ¶ 40. Valuewalk cannot retroactively qualify for the safe harbor for infringements occurring before properly designating an agent under the statute. *See* 17 U.S.C. § 512(c)(2) ("The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in [the subsequent paragraph] . . . ."). Accordingly, MGP has met its burden and the motion for summary judgment on this issue is granted.

### 3. Copyright Misuse

Plaintiff moves for summary judgment with respect to Defendants' misuse-of-copyright defense. This defense has not been firmly established in the Second Circuit and it is unclear whether an antitrust violation is required for its use. *Shady Records, Inc. v. Source Enterprises, Inc.*, No. 03-cv-9944 (GEL), 2005 WL 14920, at *15 (S.D.N.Y. Jan. 3, 2005); (S.D.N.Y. Jan. 3, 2005); *see also Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 428 (S.D.N.Y. 2010). While other circuits have applied the misuse of copyright defense to matters where "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright," such law is not binding on this Court. *Saks Inc. v. Attachmate Corp.*, No. 14-cv-4902 (CM), 2015 WL 1841136, at *12 (S.D.N.Y. Apr. 17, 2015) (internal citations omitted) (describing how the misuse-of-copyright defense has been asserted in the Fourth Circuit). This Court need not take a position on whether the misuse-of-copyright defense is available in this District, because as described below, it would not apply to these facts in any event.

Though the defense is not formally recognized in this Circuit, other courts in this District have declined to bar its use. *See e.g. Shady Records*, 2005 WL 14920, at *15; *Coach*, 756 F. Supp. 2d at 428; *Saks*, 2015 WL 1841136 at *12; *Coleman v. ESPN, Inc.*, 764 F. Supp. 290, 295 (S.D.N.Y. 1991); *Bourne v. Walt Disney Co.*, 2003 WL 721405, *3–4 (S.D.N.Y. Mar. 3, 2003); *Basic Books, Inc. v. Kinko's*

*Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991). In those cases, the courts prefaced their analysis of the defense with the caveat that the availability of the defense was merely being assumed. The cases also assumed that the defense could be applied outside of an antitrust context to bar copyright owners from prevailing on infringement claims when they have extended the scope of their limited copyright monopoly.

Here too, as in *Shady* and *Coach*, even assuming that the defense is cognizable in this Circuit, copyright misuse does not apply in this case. Defendants allege that MGP have misused copyright laws to create a market for its photographs where none exists, forcing licensees to pay exorbitant rates to use its photographs. Defs.' Opp. at 17–18. However, Defendant misstates the defense of copyright misuse. The copyright misuse defense excludes copyright holders who seek to enforce the limited monopoly granted to them by the Copyright Office. *See Basic Books*, 758 F. Supp. at 1538 (finding that a copyright holder's efforts to prevent others from infringing on its copyright was not copyright misuse or an effort to restrain competition); *Shady Records*, 2005 WL 14920, at *15 ("In seeking to prevent the [Defendants] from reproducing the registered excerpts of its copyrighted Works, [Plaintiff] is doing no more than refusing to authorize the publication of its Works, which it clearly has the right to do under the Copyright Act."). As part of the rights granted to it under the Copyright Act, Plaintiff is entitled to issue licenses "only on terms the copyright owner finds acceptable" if it wishes, including setting a price it has determined to be appropriate. *UMG Recordings, Inc. v. MP3.Com. Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000).

Defendants also fail to demonstrate that a genuine issue of material fact exists as to how MGP's licensing prices are likely to interfere "with the Copyright Act's goal of 'increas[ing] the store of creative expression for the public good.'" *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 569 (S.D.N.Y. 2013) (citing *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 206 (3d Cir. 2003), as amended (Sept. 19, 2003)). The parties do not dispute that Plaintiff

offers a stock license for use of its work, and nothing in the record suggests that Plaintiff has "improperly leveraged its copyright to extend its rights beyond those granted by the Copyright Act." *Bourne*, 2003 WL 721405, at *4. Defendants' proffered evidence does not suggest any misconduct by Plaintiff amounting to copyright abuse. Even assuming the copyright misuse defense is available in the Second Circuit and that it does not require an antitrust violation, Defendants do not demonstrate a material issue of fact on this issue and Plaintiff's motion for summary judgment is granted.

### 4. Statute of Limitations

As the Court noted previously, there is a genuine issue of material fact as to whether Plaintiff's claims under the Copyright Act are barred by the statute of limitations. Actions under the Copyright Act must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). The Second Circuit has adopted the discovery rule, in which the Plaintiff's claim does not accrue "until the copyright holder discovers, or with due diligence should have discovered, the infringement." *Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 125 (2d Cir. 2014). However, "[i]t is widely recognized that the separate-accrual rule attends the copyright statute of limitations. Under that rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation. Each time an infringing work is reproduced or distributed, the infringer commits a new wrong." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 1969 (2014). "In order to raise a genuine factual dispute over the date on which the claims accrued, [Defendant] must identify some affirmative evidence that would have been sufficient to awaken inquiry and prompt an audit on Plaintiff['s] part." *Sohm v. Scholastic Inc.*, No. 16-cv-7098 (JPO), 2018 WL 1605214, at *11 (S.D.N.Y. Mar. 29, 2018) (internal citations omitted)); *see also Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) ("[T]he limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation' . . .

irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.").

The parties do not dispute that the statute of limitations period is three years, or that the applicable rule in the Second Circuit is the discovery rule. However, they do disagree as to when the alleged infringement could have been discovered with due diligence, and therefore when the statute of limitations began to run.

Plaintiff argues that there were two separate instances of infringement, one in 2012 and one in 2015. It filed this action upon unearthing the 2015 publication, and only learned of the 2012 infringement during the discovery phase for this case. Pl.'s Rep. at 8. Plaintiff asserts that this suit only arose from the 2015 infringement, making its claims timely. *Id.* Further, Plaintiff states that any 2012 action would still be timely, due to the discovery rule. *Id.* There are several facts in the record that support Plaintiff's position. There are not one, but two images stored on Valuewalk's server. ImageRights Sighting Results. There are two versions of the Gundlach profile in the record, with differences in the text, formatting, and URL addresses of the pages. 2012 Valuewalk Page; 2015 Valuewalk Page. The register of page views shows that views of the 2012 profile stopped in 2015 and views of the 2015 profile began that year. 2012 Resource Page Views; 2015 Resource Page Views.

Defendants, on the other hand, maintain that the allegedly infringing photograph was only published on its website once and the photo was continuously available for public viewing from 2012 through 2016. Defs.' Opp. at 13–14; Defs.' 56.1 Stmt. ¶¶ 17–20. Defendants admit that they did change the text of the Resource Page but maintain that they did not republish the image; indeed, the photographs of Gundlach on the 2012 and 2015 pages appear to be the same. Defendants assert that the differences in URL addresses and page views are results of Valuewalk's change in servers. Defs.' 56.1 Stmt. ¶ 18. Defendants argue that the statute of limitations on this issue has run because Plaintiff had constructive notice of the alleged infringement from the time of its initial publication in

2012, and therefore its claims are barred. *Id.* A reasonable factfinder could determine that the Defendants only published the photograph once, and that Plaintiff had constructive notice of the 2012 infringement, because Plaintiff itself admits that Grecco dedicates resources to searching for "hard-to-detect" infringing uses of his images. Compl. ¶ 11.

The materials before the court are insufficient to determine whether the statute of limitations began running 2012 or 2015, and therefore whether Plaintiff is barred from recovering for its infringement claim. Accordingly, Plaintiff's motion for summary judgment on this particular issue must be denied.

### E. Contributory Infringement.

Defendants move for summary judgment regarding Wolinsky's liability as a contributory infringer. Many of the issues relevant to contributory liability are discussed in other parts of this opinion. As the Court has described in other sections of this opinion, there are material issues of fact regarding Wolinsky's level of involvement with the infringement. Therefore, summary judgment on Wolinsky's liability for contributory infringement is denied on similar grounds as his liability for direct and vicarious infringement.

To be liable for contributory infringement, Wolinsky must have had knowledge of the underlying direct infringement and engaged in personal conduct that induced, caused, or materially contributed to the infringing conduct. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117–18 (2d Cir. 2010) (citations omitted). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement." *Id.* Willful blindness is not an excuse, and is sufficient to satisfy the knowledge requirement. *Id.* at 118. The Defendant's participation or contribution to the infringement must be substantial. *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009).

The Defendants deny that Wolinsky had any knowledge of the infringing act, and claim that

Wolinsky never reviewed the infringing Resource Page until after Plaintiff contacted Valuewalk on July 12, 2016. Defs.' Mot. Summ. J. at 10. However, a reasonable trier of fact could find that Wolinsky should have known what content was published on his website or that he was willfully blind to any infringement, since he admitted to ignoring prior notifications of copyright infringement. *See* Wolinsky Dep. at 134:9–18; Ex. 13 to Pl.'s 56.1 Stmt. (ECF No. 92-13) ("Trent Email Chain"); Ex. 21 to Pl.'s 56.1 Stmt. (ECF No. 92-21) ("Effie Gang Email Chain").

The Defendants also claim that Wolinsky did not engage in substantial conduct that "encouraged or assisted the infringement." Defs.' Mot. for Part. Summ. J. at 10. Wolinsky correctly agrees that "[t]he fact that an individual is president and shareholder of a company is insufficient on its own to create secondary liability for a corporation's copyright infringement." *Stanacard, LLC v. Rubard, LLC*, No. 12-cv-5176, 2016 WL 462508, at *14 (S.D.N.Y. Feb. 3, 2016). But that is not the sole basis upon which Plaintiff's claim rests. All persons, including corporate officers and shareholders, "who *participate in, exercise control over or benefit from* an infringement are jointly and severally liable as copyright infringers." *Sygma Photo News, Inc.*, 778 F.2d at 92 (emphasis added).

The parties do not dispute that Wolinsky sent the contractor a different photograph of Gundlach to use for the profile page. Valuewalk Assignment Email. However, a reasonable trier of fact could find that Wolinsky's role as the supervisor of that assignment demonstrates that he did have reason to know of any subsequent changes. A jury could similarly find that Wolinsky's receipt of advertising funds from the site did create a sufficient financial interest in using an infringing photo to make the page visually appealing and draw readers to the site.

Accordingly, Defendants' motion for summary judgment as to Wolinsky's liability for contributory infringement is denied.

### F. Digital Millennium Copyright Act

Defendants move for summary judgment on the claim that Defendants violated provisions

of 17 U.S.C. § 1202(b), the Digital Millennium Copyright Act ("the DMCA").  Plaintiff alleges

Defendants violated Section 1202(b)(1) of the DMCA, which provides that no person shall

"intentionally remove or alter any copyright information."  17 U.S.C. § 1202(b)(1).  At the same

time, Plaintiff alleges that Defendants are in violation of Section 1202(b)(3), which prohibits the

distribution of works or copies of works, with the knowledge "that copyright management

information has been removed or altered without authority of the copyright owner or the law."  17

U.S.C. § 1202(b)(3).  For both provisions, the defendant must know or have reasonable grounds to

know that "it will induce, enable, facilitate, or conceal an infringement" to be found liable.  17 U.S.C.

§ 1202(b).  Copyright management information ("CMI") includes "the name of, and other

identifying information about, the author of a work."  17 U.S.C. § 1202(c)(2).  To prevail on a claim

alleging a violation of Section 1202(b), a plaintiff must show "(1) the existence of CMI on the [work

at issue]; (2) removal and/or alteration of that information; and (3) that the removal and/or

alteration was done intentionally."  *Fischer v. Forrest*, 286 F. Supp. 3d 590, 608 (S.D.N.Y. 2018) (citing

*BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010)).

Here, the Barron's article that originally published the Gundlach photo included CMI as a

gutter credit, identifying Grecco as the author of the work.  Barron's Article.  There is a material

issue of fact as to whether Defendants knew the CMI existed, and whether any removal of CMI was

intentional, as required by the DMCA.  Defendants contend that the CMI was only accessible with a

valid subscription to Barron's.  Defs.' 56.1 Stmt. at ¶¶ 88–90.  They maintain that without evidence

in the record that Defendants owned a subscription to Barron's, Plaintiff cannot show that any

person at Valuewalk had knowledge of the CMI because the image could have been downloaded

directly from Google, or directly from the Barron's server.  Defs.' Mot. for Part. Summ. J. at 14.

Defendants further argue that there is no evidence of any intentional, rather than inadvertent, CMI

removal.  *Id.* at 15.

However, a reasonable trier of fact could find for the Plaintiff on all points. The Valuewalk pages containing the work reference the Barron's article, supporting a finding that Defendants had knowledge of the CMI identifying Grecco as the photographer of the image. 2012 Valuewalk Page; 2015 Valuewalk Page. The knowledge element is further supported by the Google search results for the Gundlach photograph, proffered by Defendants themselves, which include the copyright management information with the description "Michael Grecco for Barron's." Google Image Search Result. The question of whether Defendants had the requisite intent is one that the Court is unable to ascertain from the record. Therefore, a judgment on whether Defendants had the knowledge and intent required for a DMCA violation is inappropriate at this stage of the case. Accordingly, Defendants' motion for summary judgment on the issue of liability for alleged violations of the Digital Millennium Copyright Act is denied.

## IV.    CONCLUSION

For the foregoing reasons, MGP's motion for summary judgment is DENIED on the issues of Valuewalk's liability for direct infringement, Wolinsky's vicarious liability, and Defendants' statute of limitations defense, and GRANTED in all other respects. Valuewalk and Wolinsky's motion for summary judgment is DENIED in its entirety.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 70 and 71.

SO ORDERED.

Dated:  November 6, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge